IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| U.S.A. f/u/b ARICA CONSULTING & CONTRACTING, INC., | : : : | |
| v. | : : | Civil No. CCB-05-2430 |
| GREAT AMERICAN INSURANCE COMPANY | : : | |

**MEMORANDUM**

Now pending is defendant Great American Insurance Company's ("GAIC") motion for summary judgment or, in the alternative, for a stay of proceedings. GAIC contends that plaintiff Arica was required to but did not give ninety-day notice under the Miller Act, 40 U.S.C. § 3131 *et seq.*, of its claim against the payment bond issued by GAIC. The issues have been briefed and fully argued. For the reasons explained below, summary judgment will be granted for GAIC.

Under the Miller Act, a sub-subcontractor, a company which has a contract with a subcontractor but not with the contractor that furnished the payment bond, must give written notice to the bonded contractor within ninety days of its last performance of labor or supplying of material if it seeks to make a claim on the bond. 40 U.S.C. § 3133(b)(2). The Fourth Circuit has strictly construed the ninety-day limitation on notice provisions, and explained that timely notice is a condition precedent to the right to maintain suit on a payment bond. *Pepper Burns Insulation, Inc. v. Artco Corp.*, 970 F.2d 1340, 1342-43 (4th Cir. 1992). The Fourth Circuit also has emphasized the importance of certainty in the Miller Act's risk-allocation scheme and has set a rigorous standard for enforcing its limitations without disregarding corporate forms. *See Global Bldg. Supply v. WNH Ltd. P'ship*, 995 F.2d 515, 519-20 (4th Cir. 1993). With these principles in mind, the chronology of relevant events and documents is set forth below.

1

On December 2, 2002, the United States Department of Veterans Affairs ("VA") awarded to Delaware Cornerstone Builders ("DCB"), a corporation owned by Prabodh K. Goel ("PK Goel"), the contract for the completion of a project related to Building 10 at the VA Maryland Health Care System located in Perry Point Maryland ("Bldg.10"). DCB was the "prime contractor" for this project. (*See* Def.'s Mot. for Summ. J., Ex. A, "Award Letter.") On December 5, 2002, defendant GAIC issued a performance and payment bond for the project, as required under the Miller Act, *see* 40 U.S.C. § 3131(b), guaranteeing DCB's obligations under the contract. (*See* Def.'s Mot. for Summ. J., Ex. B, "Bond".) It appears that DCB contacted Arica's vice-president Thomas Twigg ("Twigg") shortly thereafter, requesting a price proposal for some of the work required under the VA contract. (*See* Plf.'s Opp'n at 2; Def.'s Reply at 4-5.) Arica provided the requested price proposal to DCB, and on December 24, 2002, Arica received a phone call from DCB expressing interest in engaging Arica on the Bldg. 10 project. (Id.)

Around this same time, however, DCB entered into a subcontract with Goel Construction Services ("GCS"), a corporation owned by PK Goel's younger brother Piyush J. Goel ("PJ Goel"), to perform certain tasks under the VA contract.[1] Signatures on the subcontract indicate that it was completed on December 29, 2002. (*See* Def.'s Mot. for Summ. J., Ex. C, "Subcontract Agreement".) DCB, through PK Goel, then asked Arica to resubmit its earlier proposal but to address it to GCS. (*See* Plf.'s Opp'n at 2; Def.'s Reply at 4-5, 17.) On January

---

[1] It appears that GCS was to be responsible for all of DCB's obligations under the VA contract, perhaps with the exception of mechanical insulation work. (*See* Def.'s Mot. for Summ. J., Ex. C, "Subcontract Agreement".) The fact that the subcontract sum agreed to in the DCB/GCS contract was $1,200,000, and the VA/DCB contract was for $1,310,000, suggests DCB was contracting out virtually all of its obligations to GCS.

2

10, 2003, Arica submitted the requested proposal to GCS, attention PJ Goel. (*See* Def.'s Mot. for Summ. J., Ex. D, "Quote")  GCS and Arica entered into a contract for the proposed work on January 12, 2003. (*See* Def.'s Mot. for Summ. J., Ex. E, "Standard Form Agreement".)

Confusingly, this Standard Form Agreement ("the agreement") between GCS and Arica gives the impression that GCS – not DCB – had the general contract with the VA, and that GCS was subcontracting the majority of its obligations as such to Arica as a subcontractor. (*See* Def.'s Mot. for Summ. J., Ex. E, "Standard Form Agreement"; *see also* Def.'s Reply, Ex. 3, Partial Releases of Liens).   Within a week, however, Twigg signed a "Statement and Acknowledgment" form that listed DCB as the "prime contractor" and GCS as an "intermediate subcontractor."  (Def.'s. Mot. for Summ. J., Ex. F, "Statement and Acknowledgment.")

The relationship between DCB, PK Goel's company, and GCS, brother PJ Goel's company, was close.  PK Goel apparently negotiated and also signed the contract between Arica and GCS "by direction," and placed his initials at the bottom of each page of the contract. (Def.'s Mot. for Summ. J., Ex. E.)  Going forward, much of the correspondence related to the project was between Arica and GCS, but in many of those instances, it was PK Goel (the older brother and President of DCB), not PJ Goel (the President of GCS), who negotiated terms and signed correspondence on behalf of GCS. Additionally, much of the correspondence was addressed to GCS, but at the address of DCB's Maryland offices. (*See* Def.'s Mot. for Summ. J., Ex. I; *see also* Def.'s Reply, Ex. 4, Correspondence).  Further, there are examples of PK Goel, albeit on GCS letterhead, directing the day-to-day management of Arica's work, including the discussion of payment disputes. (*See, e.g.,* Def.'s Reply, Ex. 5, Correspondence.)

By the fall of 2003, payment disputes developed between Arica and GCS.  On January 6,

2004, Twigg notified GCS ("Attn: PK Goel") by letter that unless Arica received all of its "past due monies" within seven days it would "demobilize from the job." (Def.'s Mot. for Summ. J., Ex. I, Correspondence.)  A copy of this letter was sent to the VA but not to DCB.  *(Id.)*  A January 21, 2004 letter from Twigg to GCS requested certain payment "so as not to bring GCS bonding company and the Owner into the equation." (*Id.*, Ex. I).  On January 28, 2004, by letter to GCS, Arica requested a copy of GCS's performance bond.  (Def.'s Reply, Ex. 4.)  A January 29, 2004 letter from Arica to GCS states that "Arica is forwarding all of its documentation concerning this matter to its bonding company and feels that GCS may want to put their bonding company on notice." (Def.'s Mot. for Summ. J., Ex. I.)  DCB was not copied.  On February 11, 2004, Twigg wrote to DCB asking for a return of the payment and performance bond "submitted to your firm" in January 2003 because "there is no contract between Delaware Cornerstone Builders and Arica Consulting & Contracting LLC for this project."  (Def.'s Reply, Ex. 1.)  After attempts to recover approximately $197,000 from the Goels apparently failed, Arica brought this claim against the surety bond issued by GAIC to DCB.  GAIC denies liability based on lack of timely notice under the Miller Act.

If Arica was merely a sub-subcontractor, or second tier contractor, then the Miller Act's ninety-day notice requirement applies. *See* 40 U.S.C.A. § 3133(b)(2).  Arica first argues that this Miller Act requirement should not apply because Arica was a direct sub-contractor with DCB.  Arica supports this argument by contending that GCS was a mere "shell," or, in other words, that DCB and GCS were, *de facto*, one corporation.  Arica is correct that if GCS's corporate forms were disregarded by the court, as is permissible under certain circumstances, then Arica could be considered a subcontractor, not a sub-subcontractor, and the ninety-day notice requirement

would not apply.

There is some evidence that Arica can point to in arguing that DCB and GCS were, *de facto*, one corporation, or that GCS was merely a "sham," and that the two should be "collapsed" here. For example, P.K. Goel signed off on much of the relevant correspondence. The standard for "piercing the corporate veil" in Maryland – as well as under federal law – however, is strict.[2] Absent strong evidence of intentional fraud, courts are reluctant to ignore corporate forms. *See Global Bldg. Supply*, 995 F.2d at 520 ("Corporate forms exist to limit liability, and courts are reluctant to set them aside simply because they've done so."); *see also Ice. Telecom. Ltd. v. Info. Sys. & Networks Corp.*, 268 F. Supp. 2d 585, 591 (D.Md 2003) ("Maryland has a markedly restrictive approach to piercing the corporate veil."); *Hildreth v. Tidewater Equip. Co. Inc.*, 838 A.2d 1204 (Md. 2003).[3] Here, there do appear to be corporate records, and GCS does not appear

---

[2] There is some question whether the Maryland or federal standard for "piercing the corporate veil" applies. *See Global Bldg. Supply Inc.*, 995 F.2d at 515, n.5 (4th Cir. 1993)(addressing the lack of clarity on this point). As in *Global*, resolving this issue is unnecessary, as Arica fails to make an adequate showing under either federal or state law.

[3] Under Maryland law, there must be a showing of: (1) "complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;" (2) that "such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights;" and (3) that such "control and breach of duty proximately caused the injury or unjust loss." *See Hildreth*, 838 A.2d at 1210. Although it does not help Arica here, under Maryland law, collapsing the two corporations may be possible absent a showing of fraud. *See Hildreth*, 838 A.2d at 1210-12. The Fourth Circuit has further articulated that the decision to pierce the corporate veil involves "a case-by-case factual inquiry in which the presence of the following factors suggests with varied force the appropriateness of disregarding the corporate forms distinguishing two business entities: gross undercapitalization of the subservient corporation, failure to observe corporate formalities, nonpayment of dividends, siphoning of the subservient corporation's funds, non-functioning officers and directors, a lack of corporate records, and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders." *Global*, 995 F.2d at 520 citing *Keffer v.*

to be insolvent. (*See* PK & PJ Aff., Jan. 31, 2006. GAIC has submitted separate corporate filings and annual audits for both DCB and GCS. (*Id.*) Further, there is no evidence of GCS's failure to observe corporate formalities, nonpayment of dividends, or of a siphoning of GCS's funds. There may be some evidence of DCB exerting a significant amount of control over GCS, but it is difficult to say that it rose to the level of depriving GCS of any "will or existence of its own." Moreover, there is no evidence that any such control was intentionally used to defraud Arica.

In any event, no matter how the evidence is viewed with respect to prongs one and two of the *Hildreth* analysis, *see, e.g., supra* note 3, the third prong, which addresses causation, cannot be satisfied. The record establishes that Arica was aware of the three-tier relationship – and its position therein – which triggered the Miller Act requirements. Arica knew its contract was with GCS, (*See* Def.'s Mot. for Summ. J., Ex. F, "Statement and Acknowledgment;" (Plf.'s Opp'n, Thomas Twigg Decl. ¶ 8 ), and knew that it did not have a contract with DCB. (*See* Def.'s Reply, Ex. 1, Feb. 11, 2004 letter.) Moreover, Arica knew that DCB was the prime contractor. (*See* Plf.'s Opp'n, Thomas Twigg Decl., ¶ 4, 5.) Arica cannot claim that it was misled by whatever confusion, if any, was created by DCB and GCS. *See, e.g., Global*, 995 F.2d at 520 (noting that commonality of ownership and control, without more, does not justify setting aside corporate forms, and emphasizing that plaintiffs "failed to establish that any party had difficulty determining whether it was dealing with [two corporations]").

*Miller Act notice*

---

*H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir.1989). Courts have summarized the inquiry as determining whether the corporation is a mere instrumentality. *See Ice. Telecom.*, 268 F. Supp. at 590.

The requisite Miller Act notice to the prime contractor may be either express or implied. *See United States f/u/b Noland Co. v. Skinner & Ruddock, Inc.*, 164 F. Supp. 616, 621 (E.D.S.C. 1958).[4] The Fourth Circuit has not recently nor directly addressed the exact situation here. *See, e.g., S&G Excavating, Inc.*, 236 F.3d at 885 (not listing the Fourth Circuit as one which had addressed the issue).[5] It does appear, however, that the implied notice standard is met in this Circuit when the notice can be said to alert the prime contractor that it is being looked to for payment or that a claim against its bond will be pursued. *See United States f/u/b Henry Walke Co. v. Van de Riet,* 316 F.2d 912, 916 (4th Cir. 1963) (finding letter giving notice to be insufficient because it could not be construed as an assertion of a claim upon the payment bond); *Noland Co.*, 164 F. Supp. at 621 (holding that notice must advise prime contractor, expressly or by implication, that the claimant is looking to it for payment of the subcontractor's bills).

Here, it appears that the prime contractor, DCB, through its sole officer, PK Goel, was

---

[4] Courts differ, however, over what "implied notice" will actually suffice and, relatedly, whether the notice must include a specific indication that the claimant is looking to the prime contractor for payment or that a claim might be made on its bond. *Compare Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1437 (11th Cir. 1996) (requiring that notice inform prime contractor that claimant was asserting a claim directly against it); *United States f/u/b Kinlau Sheet Metal Works, Inc. v. Great Amer. Ins. Co.*, 537 F.2d 222, 224 (5th Cir. 1976) (accord), *with United States ex rel. S&G Excavating, Inc. v. Seaboard Sur. Co.*, 236 F.3d 883, 885-86 (7th Cir. 2001) (refusing to add to the Miller Act the requirement that the notice expressly alert the prime contractor that it is being looked to for payment). *See also United States f/u/b Water Works Supply Corp. v. George Hyman Constr. Co.*, 131 F.3d 28, 33 (1st Cir. 1997) (holding that notice must include "bringing home to the [prime] contractor that the [claimant] is looking to it for payment," but emphasizing that courts have not required formalistic proof thereof, and allowing written notice of payment disputes to be supplemented by oral and other written exchanges).

[5] The Fourth Circuit is clear, however, that the ninety-day limitation on notice provision is exempted from the otherwise liberal construction of many of the Miller Act's provisions. *See Pepper Burns Insulation, Inc.*, 970 F.2d 1340, 1343 (4th Cir. 1992).

7

aware of the payment dispute. (*See, e.g.,* Def.'s Mot. for Summ. J., Ex. I, November 18th, January 6th, 21st & 29th letters; *see also* Def.'s Reply, Ex. 4, Correspondence.)  While the letters discussing the dispute were addressed to GCS, the address was that of DCB, and the letters were to PK Goel's attention. (*See id.*)  GAIC does not dispute this fact.  A prime contractor's awareness of the existence of a payment dispute between one of its subcontractors and sub-subcontractors, however, does not satisfy the Miller Act requirement. *See Maccaferri Gabions*, 91 F.3d at 1438.  The correspondence in question must amount to "implied notice" that DCB was being looked to for payment or that a claim might be made on DCB's bond. *(See id.*)

Here, the relevant correspondence continually referred to the payments owed by GCS, not DCB.  Near the end of the trail of correspondence between the parties, Arica indicates that the various bonding companies may soon become involved. (*See* Def.'s Mot. for Summ. J., Ex. I, January 21st and 29th letters; *see also* Def.'s Reply, Ex. 4, Correspondence, January 28, 2004) Arica's reference to the bonding companies is potentially significant, as courts assessing "implied notice" often look for indications that claims on the prime contractor's bond will be made.  *See, e.g., Water Works Supply*, 131 F.3d at 33-34; *Van de Riet,* 316 F.2d at 916.  Here, however, Arica specifically refers to GCS's bonding company, and not DCB's. (*See* Def.'s Mot. for Summ. J., Ex. I, January 21st and 29th letters.)  Accordingly, even construing all the evidence in the light most favorable to Arica, Arica did not provide DCB with notice adequate under the Miller Act.  GAIC's motion for summary judgment must be granted.

A separate Order follows.

| | |
|---|---|
| November 2, 2006 | /s/ |
| Date | Catherine C. Blake<br>United States District Judge |